Morning ladies and gentlemen. As you can see, Judge Wardlaw is appearing by video from Pasadena. Can you hear us, Judge Wardlaw? Yes, good morning. Good morning. And I want to thank all of you for traveling here. I know that these are difficult times and travel is especially difficult, but we thought this is the case that we needed to hear given the time constraints, so we appreciate you all making the effort to come here. With that, we'll proceed with CR Club v. Trump. Mr. Byron. Thank you, Chief Judge Thomas. May it please the Court, I'm Thomas Byron from the Justice Department here on behalf of the federal government defendants. Many of the issues and the arguments presented here overlap with those that this court has considered in the earlier appeal from the same case in the 8005 and 284 issues, so I'd like to jump directly to the purpose and the terms of Section 2808, which is the statute at issue in this case. Before you do that, do you challenge the Article 3 standing of any of the plaintiffs here or raise any other threshold objections other than the zone of interest arguments that you've made to reaching the merits in this case? No, Judge Collins, we've not challenged the Article 3 standing. We have, as you noted, raised the threshold concern about the zone of interest requirement, but the District Court did address the Article 3 standing question in the decision below, and we have not taken issue with that. Turning to the purpose of Section 2808, which of course goes both, Judge Collins, to the zone of interest question as well as to the merits of the issues here, Congress in that statute provided extensive, expansive discretion for the Secretary of Defense in times of war or national emergency requiring use of the armed forces to reprioritize the funds previously appropriated by Congress for military construction in order to support the use of the armed forces in connection with that national emergency. Can I stop you there? I want to you said reprioritize. I want to understand if I can, and especially in of your arguments in the first part of the case, what actually happens? Is there a transfer and a reprogramming of money from one account to another account and then an expenditure differently? How does the money move in this case? No, Your Honor, there's not a transfer or a reprogramming of any kind. All of the funds that were appropriated that are at issue in this case were originally appropriated for military construction projects. They're merely being used for other military construction projects than those initially identified by Congress and the Secretary of Defense in the budget process. So in order to be expended here, they don't need to be moved from one account to another account first, as was true in the first part of the case? That's right, Judge Collins. And in fact, I think it's worth emphasizing that the decision by the Secretary of Defense at issue here to defer military construction projects in order to make available the funds that would otherwise have been used for those projects is not a decision to deny or defund those projects, as it's been characterized incorrectly by the plaintiffs in the district court here. It's merely a decision not to undertake them at this time. They remain on the list of military construction projects and can be undertaken in the future when funds become available. So turning back to the purpose, Your Honor, there's nothing in the terms or the context of this statute that would suggest that Congress intended to constrain the authority of the Secretary of Defense in that time of war national emergency in the ways that the district court here suggested. So first of all, the district court thought that the definition of military construction, which in turn refers to the definition of military installation, was somehow restrictive. That's not so. Military construction includes any construction with regard to, I'm sorry, with respect to a military installation. And a military installation, by its general understanding, as the Supreme Court emphasized in APEL, is synonymous with military jurisdiction. The definition in Section 2801 makes that clear. It refers to several examples of the ways in which the military exercises jurisdiction at base, post, camp, et cetera. But it ends with a catch-all phrase that reinforces the common-sense and well-understood definition of military installation as synonymous with military jurisdiction. Other activity. And that's what is at issue here. There is no, there can be no dispute that the project sites here are subject to military jurisdiction. They've been acquired by the military and they are subject to the authority of the military. Well, formally- Counsel? Yes, Judge Wardlock. I'd like to ask a question. So the district court here said that your definition of other activities was boundless or limitless. What, in your mind, would circumscribe that definition? Judge Wardlock, I think what circumscribes it is what the Supreme Court referred to in the APEL case, and that is that it is synonymous with the exercise of military jurisdiction. In other words, other activity is not meant to be a limiting principle, but in fact an expansive principle. And that definition is not intended to be anything less than the definition of military jurisdiction. That doesn't mean it's boundless, Your Honor. There are procedures and legal requirements that the Department of Defense has followed here that govern how the military acquires and exercises jurisdiction. And in that sense, the exercise of military jurisdiction is itself a limiting principle and a meaningful one. If I may turn to the district court's reasoning and the plaintiff's arguments about what they view as a limiting interpretation of military installation and therefore military construction, the district court thought it meaningful that the sites for nine of the projects at issue here—there's no dispute, after all, for two that are on the Goldwater Range, which is a bombing facility—but for nine others, the military acquired jurisdiction for—for seven of them, I should say—the military acquired jurisdiction from other federal agencies and assigned them administratively, those sites, to Fort Bliss. But it could equally have assigned them to a new installation, called it anything it wanted, or even to any of those instances, they all would equally have been exercises of military jurisdiction and therefore military installations within the meaning of Section 2801. The judge—the district court's focus on Fort Bliss, its distance, its perceived somehow different from the nature of the project sites, was therefore inapposite. The district court also thought it significant that these sites had not previously been used by the military, but that's often going to be the case in time of national emergency where the military acquires sites, subjects them to military jurisdiction because of the very need to support the use of the armed forces in connection with that national emergency. That can't be the limiting principle. It would prevent most uses of Section 2808 in events of national emergency or even declarations of war. Turning then to the other term in Section 2808 that the district court latched on to, the idea that these projects are not necessary for such use of the armed forces. The chairman of the Joint Chiefs of Staff has made the determination that these are necessary projects. The military construction here is necessary to support such use of the armed forces because they serve as force multipliers. They permit the redeployment and the more efficient and effective use of military personnel and other resources, including, for example, the operation of mobile surveillance cameras, aerial surveillance operations, aerial transport operations, which will then be able to focus more efficiently on areas where, on a more limited number of areas than previously they had to stretch their resources more thinly. So the district court thought that Congress in Section 2808, by referring to and using the word necessary, was intending to limit the authority of the Secretary of Defense, but that's not consistent with the statute. It's also not consistent with the ordinary principles of deference, indeed preclusion, that apply when the- Counsel, may I ask another question? So that argument sort of conflates the statute because the statute, as it's worded, uses a concept of necessary twice. It says that the national emergency must be one that requires the use of armed forces, and I take it now you're arguing about not otherwise authorized by law that are necessary to support that use. Can you discuss the first prong of this concept where it seems to read that the national emergency must require the use of the armed forces? Yes, Judge Wardlaw. So the President, in his declaration of a national emergency, determined that the particular national emergency here is one that requires use of the armed forces to meet that requirement. So the President determined that, going back to the original, to an earlier declaration, proclamation, I believe it was, that he had directed and the Secretary of Defense had deployed troops and other resources to the southern border to assist the Department of Homeland Security with securing operational control of the border. And in light of the crossing of illegal narcotics, other smuggling, and illegal crossings that was overwhelming the available resources of DHS, Your Honor, and that in light of that and the declaration of the national emergency, the President determined that this was therefore a national emergency requiring use of the armed forces. None of the plaintiffs in this case have challenged that. The district court here correctly recognized that it is beyond judicial review, and we think that obviously was correct. Turning then to the meaning of this statute, where the President has made that determination, the statute's predicate is satisfied. There has been a declaration by the President of a national emergency that requires use of the armed forces. There's nothing further for the Secretary of Defense to do when that predicate has been satisfied. There's nothing for a court to do when that predicate has been satisfied. And therefore, the proper focus, as the district court recognized, is on what it means when Congress later in the statutory provision said that military construction projects may be undertaken that are necessary to support such use of the armed forces. That is, the use of the armed forces in connection with the national emergency. Here, that use of the armed forces is to support DHS in securing operational control of the border. And that support takes place in several ways. There's logistical and administrative support. There is, as I explained a moment ago, the operation of surveillance cameras, surveillance by aerial operations, aerial transport operations, and the like. All of those can be done more efficiently. Those troops and resources can be deployed to other locations along the border. And that is essentially the kind of military judgment that the Secretary of Defense is charged with making, and here did make, in consultation with the Chairman of the Joint Chiefs. Finally, I'd like to address the balance of harms and the public interest. We've explained in our brief that in this appeal, as in the earlier appeal, the balance of equities does not support the entry of an injunction or a declaratory relief. And in this case, the district court properly entered a state pending appeal in light of the Supreme Court's entry of a state pending appeal in the earlier appeal. But would there then be no remedy? So if we were to find that there was a cause of action, and that it was not within the parameters of 2808, and that it was unauthorized, we should just do nothing and let it go forward? Well, Judge Collins, I think the answer to that is yes. And let me explain why. So the availability of an injunction is not a matter of course when a court finds that there's been a violation of law. And the Supreme Court and this Court have recognized that repeatedly. Declaratory judgment, likewise, is an exercise of the same equitable powers as its injunctive authority. And for those reasons, we believe that the balance of harms in this case, as in the earlier appeal, does not support either injunctive or declaratory relief. Now, that doesn't mean, of course, that the court can't reach its legal conclusions if it finds that these are proper plaintiffs to bring these claims concerning these projects and enforcing these statutory provisions. All that it means is that the exercise of equitable authority requires an additional analysis beyond that legal determination, Your Honor. If there are no further questions, I'd like to reserve the remainder of my time for rebuttal. Just one. Can you tell us what the status of the construction is right now? Your Honor, I believe that the status in several sites, and I don't recall how many, has begun. I don't believe it's been completed, any of the sites, the last time I checked with DOD. Very good. Thank you. Good morning, Your Honors. If it's all right, I'd like to briefly just address the reviewability question, not looking to duplicate what we did here before, and then turn to the other questions. I want to emphasize that not only have defendants asked you to disregard entirely the previous panel's persuasive decision, but in addition, they are asking you to create a circuit split with the D.C. Circuit when they say, as to both parts of this appeal, that there is no review of all treverous actions without meeting a zone of interest requirement. As we pointed out, that clashes both with Haitian Refugee Center, as well as Chamber of Commerce v. Reich, both of which are cited in our brief here, as well as Aid Association for Lutherans v. U.S. Postal Service, which is cited in our previous brief. That said, Section 2808 really has to be met, or has to be contended with in this case, regardless of what this Court finds as with respect to Section 8005. And that's both because, as we've explained, the Supreme Court in this case is even arguably within a statute, then interests relating to land use, whether they be aesthetic or environmental, are within the zone of interests. But it's also because, and Judge Thomas, this goes to a question you asked last time we were here about all treverous defenses, and whether there was a zone of interest that applied to a defense. It's because in this appeal, we also have, and this is at ER 37 of the District Court's decision, a claim under the National Environmental Policy Act. And there's no argument that defendants have made in this case, except that Section 2808 provides them with authority to disregard the requirements of the National Environmental Policy Act. Defendants, I assume, would agree with us, we are within the zone of interests of NEPA, and their only defense to it, again, is Section 2808. At ER 37, the District Court says, if they are complying with Section 2808, then perhaps they can evade NEPA strictures, but the District Court found that, of course, they were not complying with Section 2808. Therefore, there is no way to avoid the Section 2808 question. This Court has to grapple with it, and has to decide whether defendants have authority under Section 2808. On that question of whether they have authority under Section 2808, I think it's pretty clear that the District Court was correct in that defendants are advocating for an NEPA. Section 2808 is free to fund whatever projects, whatever civilian projects, Congress rejects. We're not writing on a blank slate here, in terms of who is responsible for border security. Congress set up a comprehensive system, and at pages 47 to 49 of our brief, we lay those out. It not only set up a system in which it is clear that civilian law enforcement is charged with protecting the border and conducting immigration enforcement, it even provided specifically in 8 U.S.C. Section 1103 for what to do if there is, quote, an actual or imminent influx of aliens near a land border that presents urgent circumstances. So this is not a situation in which Congress is silent, and we're trying to puzzle out what can the Department of Defense do, what is its responsibility within our system. Congress has told us, and that's also why defendants have basically said, well, because we deployed troops, that ends the inquiry. But that argument proves far too much. At, I think it's ER 216, they themselves point out that among the Department of Defense resources that they've allocated as part of this border surge is military lawyers who are, you know, conducting immigration prosecutions in U.S. federal courthouses along the border. If Congress provided office space for immigration attorneys, they would not be able to do so under military construction merely because they've sent lawyers to the border. Similarly, Congress has been considering both the border wall but also other immigration enforcement related issues like how many prisons should be built to hold arriving immigrants, should there be prison space provided for immigrant families and children. These are enormous and consequential policy questions that Congress has considered and legislated. Under defendants' view, because the emergency proclamation declares that the entry of unarmed family units requires the use of the armed forces, that ends this court's inquiry and that ends Congress's role. Should Congress decide that it does not want to provide spaces for family detention, immigration detention, then the Department of Defense can say, well, holding unarmed immigrants is a force multiplier, allow us to redeploy those troops who are currently charged with doing wellness checks and warming up meals, again, all of which are things that the defendants have said they're providing to DHS. That is such a radical departure from both how Congress set up our immigration system and how Section 2808 has historically been deployed that it's, I mean, it would require, I think, a very persuasive reason for this court to pass Section 2808. And I haven't heard one. All I've heard is the exercise of military jurisdiction is itself a limiting principle and that this court shouldn't even look to who is in charge of immigration enforcement in our system. I also want to say, I think I heard the defendants say that none of the plaintiffs challenge that this emergency requires the use of the armed forces. We certainly did, Your Honor, and we make that argument here as well at pages 46 to 53 of our brief. Finally, turning to the equities, again, this isn't a new context in which the executive branch is saying national necessity, military necessity requires that we take an action. And if we're already at the equities, which is to say you've already found, as the district court did, that Section 2808 does not authorize this conduct, then although the defendants say you should just let it happen anyway, there is no case that stands for that principle. Instead, we're firmly in Youngstown Territory, and there you have a series of decisions, all of which say the court doesn't turn a blind eye to it. So you have Justice Frankfurter saying, you know, it's not the court's role to rebalance the equities when Congress has spoken. Here you would have found that Congress has spoken by saying that 1.375 billion is what should be allocated to the border wall, and not the 3.6 billion that's at stake here. But more than that, you'd also be looking at a situation in which in Youngstown, when the court upheld the injunction, when the Supreme Court said, although this is a case in which the gravest military necessity has been invoked, the steel production for the war effort, there were, at that point, we're years into the Korean War, there were a hundred eight thousand American casualties already fallen, and nonetheless, the Supreme Court said, when they have no authority to step beyond what Congress provided, it's not the court's role to give them that authority. Instead, it's the court's role to enforce a core separation of powers distinction. I guess I would just note, finally... Can we go back to the text of 2801? Why, you know, it has this list of terms, and then it says there are other activity under the jurisdiction. Why isn't that sufficient as a marker to bring this in 2808? Well, I think, Your Honor, that if or other activity under the jurisdiction meant literally all activities under the jurisdiction of the Secretary of Defense, then there would have been no need to use all those other terms. So this is what the Supreme Court told us, for example, in Yates v. United States. When there's a list of documents, and then it says or other tangible object, you don't interpret other tangible object to and there are many cases the district court cited. In general, we don't use a list of terms with a residual clause to say the residual clause extends far beyond every other one of those terms. But what's unusual about it is each of those things is a place, a base, a camp, a post, a station, a yard, or center, and you would expect or other location or facility, and instead it says activity. Doesn't that... The fact that the term is different from the things that preceded, doesn't that provide a textual clue that it goes beyond merely the types of terms that preceded? I think that's quite possible, Your Honor. The district court did say, you know, other activity doesn't mean only base, post, camp. It is trying to capture some other type of action that the Department of Defense engages in, but it doesn't... It shouldn't be read to literally swallow all of those other items in the list and render them superfluous, because what they're saying is not other activity. They're saying literally any land under DOD jurisdiction, and of course here there is no activity that DOD is going to be conducting at these sites. Their entire theory of force multiplier is that DOD will take those soldiers who are currently stationed at these border sites that they've announced are military installations and move them immediately to new sites, which are not military installations, which remain under DHS control. And so there's no way in which DOD is conducting any kind of military installations. And this case doesn't call upon you, I think, to stake out the outer limits of that term. It just says that their limitless version of it cannot be correct. May I ask you a specific question about the Goldwater Range? If we just take that, forgetting all the other projects, why isn't that under... Why doesn't that satisfy Section 2808? Your Honor, we don't argue that the Goldwater Range is not a military installation. So for nine of the 11 projects, we say they're not military installation. For the Goldwater Range, we're in agreement with the defendants that the Goldwater Range is a military installation. As to those two projects, though, they still haven't satisfied the other Section 2808 prongs, in that border security to prevent immigration, which is what the... which is entirely what the administrative record says about the Goldwater Range. So there's... and I apologize, I realize I'm a little bit over, but in their version of drugs or whatever onto the range affecting military activities, and as we point out, the administrative record is very clear. The only military interest in the Goldwater Range barrier is to reduce the burden on DHS, which conducts border security on the range against unauthorized entry. So we don't argue in any way that the Goldwater Range projects are not on a military installation. I understand that, but I... but in terms of the Department of Defense's ability to build a wall or a border on the range, it would seem to me if... if we have to, in order for your challenge to succeed, we have to say, well, the authority has cabined somehow the Department of Defense to construct walls on its own property. Well, again, Your Honor, we're not saying... I mean, I think your argument is they said it was for one reason, but it's really not. That's true, Your Honor, but I think that goes to this... to Section 2808 specifically. So, of course, if the Department of Defense believed that a wall was necessary on the Goldwater Range, what they would do is they would go to Congress and they would say, we need a wall on the Goldwater Range. That's how Congress exercises its control over the budget and over activities, and all of the military construction activities that Your Honor was asking about that were... that were deferred or defunded or however the government wants to call it, what happens is the Department of Defense presents to Congress and it says, we need this wall. If you have an emergency and it requires the Armed Forces, then you could build a border wall, you know, maybe if it was to repel a military invasion. If that was something that there was an emergency need for on the Goldwater Range or anything else, then, you know, perhaps Section 2808 would be satisfied, but that's not the case here, and so it's not about DOD's ability to construct walls. DOD can construct any kind of facility on the Goldwater Range, but what it does is it asks Congress to fund it. It doesn't use 2808 to circumvent Congress. Thank you, Counsel. Thank you, Your Honor. Good morning. May it please the Court, my name is Heather Leslie and I'm appearing today on behalf of the Plaintiff States. I'd like to take a step back and discuss something that, while we did discuss last time, it's still very relevant here. Those are our three separate constitutional claims. These claims are sufficient to rule in the state's favor regardless of Section 2808, and these three claims are our Separation of Powers Claim, our Presentment Clause Claim, and our Appropriations Clause Claim, and it's important to understand that each of these are separate, independent claims which can provide the basis for ruling in the state's favor, and they are the same as they were when we were here last time with the previous motion, and that's because the defendant's actions are essentially the same. So what happened under the separation of powers is that Congress made its express will very clear. It said you get 1.375 billion dollars for a border barrier in southeastern Texas, and what the to build additional barriers in additional locations. When it appropriated that sum, did it repeal the authority in 2808? No, Your Honor. It's not an express appeal. But then how do we have a judgment that no other authority may be used? Well, this goes to the Appropriations Clause, which says that all uses of appropriated funds must be affirmatively approved by the state. But 2808 mentions appropriations and says the extent of the appropriations that may be used for the things authorized there, doesn't that, if 2808 applies, doesn't that satisfy the Appropriations Clause? No, Your Honor. If 2808 is satisfied, we still have a separate Appropriations Clause Claim because, this goes to the specific over general rule, we have a specific appropriation for 1.375 billion and attempt to use general authority, which is section 2808, to supplant that. We know from cases like Nevada versus Department of the Energy that that's unacceptable. The court can't, or the defendants can't come in and supplant. Yes, Your Honor. So does the Appropriations Clause, it prevents Congress from having one general construction authority for the appropriations clause prevents Congress from authorizing spending in that way with the general statute of one agency in a specific to another? I'm not seeing how the constitutional limit emerges from the Appropriations Clause. Congress can authorize spending how it wants. I want to be clear, Your Honor, there certainly may be uses of section 2808 that may be permissible and there are certainly general funds that can be tapped in emergencies or health crises or something like that. But what cannot be done is where Congress has given a specific limit the very same day that the President signs that into law, he can't modify it and add to it with an additional billions of dollars and new locations. So that's what's at issue here. It's that there is specific congressional intent on the record, very clear, abundant. We had a record-breaking government, partial government shutdown over this. And so in comparison, when you look at those facts, that's why we have these key constitutional claims here. It's because of the record of what happened in this case in particular. So there certainly could be uses of section 2808 that comply with the Constitution. But as applied here, the use of section 2808 is unconstitutional. Given that, I would like to turn to what's newly before this court. Importantly from the financial harms. So we have, we are suffering 36 million dollars in lost tax revenue as a result of the deferred projects that you heard the defendants speak about. And I want to be clear, though the defendants said that they are not canceled, there's no money for them to go forward right now. And many of these projects were scheduled to have already gone forward. So if you look on the helpful chart that says the award dates that were for each military construction project, it's been deferred. So for example, there was supposed to be a child development center in Maryland. It was going to cost 13 million dollars. The award date for that contract was January 2020. So we've already passed that. So we're already suffering a harm. Does the deli that's next door to that child care center, do they have a claim too? Because their business will go down because the child care center isn't completed? How far do the ripples of economic harm go out? Your tax revenue is the business next door that's adversely affected. How far does this go? Sure, so certainly no matter who challenged this action would need to have Article 3 standing. That's a very like City of Sausalito where we have a city declarant explaining that the loss of tax revenue from decreased, sorry, increased traffic and air pollution downtown as a result of a federal project would decrease the tax revenue of the business center of the city. And there the Ninth Circuit said that was sufficient and we certainly have that here. We have unrebutted evidence from an widely used economic model and determined the amount that the states would lose from that. So we don't have the traceability issues that cases like Iowa versus Block and Arias versus Dinecourt raise in that defendant's site. Where there it was looking at things like general budgetary deficits and comparing them and trying to look backwards and say what caused them. Here we have unrebutted evidence that starts with the projects that have been defunded and goes forward from that. So we don't have the same traceability issue that defendants in the cases they cite. So it would, you know, be a question as to whether or not someone could prove it in that sense. But I think importantly for our constitutional claims too, this goes to a question about the zone of interest. And the zone of interest test does not apply to the Trevira's claims. But if this court chose to look at this case through an APA lens, I think that's where the financial interests are particularly important. Because on page 22 of their opening brief, defendants describe section 2808 as a internal transfer provision, but, I'm sorry, not a transfer provision, but something that is used to change the balance of priorities for different military construction projects over another. And that's precisely what the states are injured by here. By prioritizing border barriers over the military construction projects that were set to go forward in our states, the states are being harmed by defendants' actions. And given that the zone of interest test isn't about showing that Congress intended to include the plaintiffs in that zone, but rather showing that the plaintiffs are the ones that enacted that statute, it's clear that the financial interests of the state are well within the zone of interest of section 2808. With the rest of my time, I'd like to discuss section 739, which is another important statutory provision that we haven't discussed yet today. Defendants explained when describing how this monetary process works that this is not a reprogramming or transfer provision. And they certainly didn't say that it was one in this, which would be the 2019 Consolidated Appropriations Act, or another Appropriations Act. And so it's clear from the language of section 739 that Congress did include a prohibition on exactly what defendants are doing here, supplanting their budgetary authority and their budgetary decisions with billions more dollars for the same item that they've already taken issue with. And so because of that, we have an additional statutory claim, an additional evidence of Congress's intent in this particular case. Turning to the balance of the equities... Before you leave 739, what's your response to their argument that program, project, or activity is a budgetary term of art, as is reprogramming or transfer? And given that this doesn't involve the shifting of funds from one account to another, that 739 doesn't apply at all? Well, certainly, if 739 doesn't apply, then they don't have the authority to supplant the decision that Congress has already made. But importantly, in 739 too, it says in this Appropriations Act or another Appropriations Act. And so that's about Congress going back and considering funding and deciding where to give more money to. And here, we simply don't have that. We have a more general authority. That clause is attached to reprogramming or transfer. So their theory is that because it's program, project, or activity, it's talking about moving funds. And the Act says you can't do that unless such change is made pursuant to a reprogramming or transfer provisions of this or any other Appropriations Act. But it still has to be a reprogramming or transfer. Their argument is that it's because there's no reprogramming or transfer that 739 doesn't apply. What is your response to that? Even if this Court were to take that view, I think it's important to step back and look at the constitutional claims and the appropriations clause in this specific... No, I'm trying to understand. Within the corners of 739, I want to know what your Well, if it were referring to their transfers, it would still have to... And they're saying that this is not a transfer, then perhaps Section 739 doesn't apply. But we don't think that's correct. What they're doing here is transferring funds from one military construction project to another. And they've pointed to nothing to suggest that it's different in this scenario simply because it doesn't meet what they call a reprogramming or transfer provision. But the key language is that that's how you could supplant Congress's intent and add to the budget that they had, and that's simply not what we have here. I see that my time is up, so I would like to request an injunction on behalf of the states in particular, and thank you very much. Thank you, counsel. Good morning, Your Honors. Josephine Morse for the U.S. House of Representatives. And first, we wanted to thank the Court again for extending us the courtesy to allow us to continue to participate in this very important litigation, given the ongoing appropriations clause violation that's happening here and its direct effect on Congress. If I might, I would like to make a few brief points about the statute that the administration is raising as its defense here. First, with respect to military installation and the definition in the statute, I think it's important to understand that what is actually happening here is we have individual parcels of land, one mile here, two miles there, you know, 20 miles in another area, that are all being stitched together and called a military installation. So I do think that we have a real situation where, you know, using the catch-all phrase to address Judge Collins' question really does allow for a limitless definition and interpretation of the statute that goes against Congress's intent. You know, and I think it bears emphasis in repeating what the history of this statute and sort of the intent of these kinds of emergency authorities are. You know, this is a statute that's intended to be used in a time of national emergency where there's been a declaration of war, or a declaration of war. In the past, this has been used 18 times from 2001 to 2014 for a fraction of the amount of money, the 3.6 billion at issue here, less than half of that. In a true military situations that no one would dispute, security for helping, you know, purify the water supply in Afghanistan, in Iraq, in military locations. And, you know, I understand the question about other activity, but it is given meaning by being in that list of terms that preceded, and it doesn't mean just sort of disparate parcels of land brought together for a purpose that is divorced from a military purpose. Moving on, I wanted to also address another, the other prong of the statute, necessary to support the use of the armed forces. You know, I think that the record here is clear, and I think my colleague from the department said as much, that what's going on here is support of DHS and CBP, not support of the armed forces. And certainly, with respect to the statutory term use, what's envisioned here is actually going to, at the end, obviate the need to use the armed forces, because they will be involved in other activities. So really, you know, looking at the record, the entity being supported here are DHS and CBP, not the military. And that, again, goes against both the plain terms of this, of the statute. It does not meet the military necessity standard, and really goes against Congress's intent in passing these kind of emergency authorities that allow, in true emergencies, for funds to be moved from one set of military construction projects to another. I gather the House agrees that the states are suitable challengers to raise an appropriations clause and related causes of action. So we have not, independently, in our amicus brief, in this case, briefed the threshold issues. We have, in our past briefs, in this ongoing litigation, addressed those issues. And we stand by what we've said in our prior briefs, that there is an appropriations clause violation going on here, a quite serious one, and that there are, you know, injured parties who we're supporting here. Yes, my precise question really went to sort of a zone of interest issue, that question is whether the states are suitable representatives of the House. And I know, you know, what we've said in the past, and what Mr. Letter said when he was arguing before you in the fall, was, you know, that we think the zone of interest analysis in the D.C. Circuit, opinion in Haitian refugees, really controls here. When you're talking about an executive branch action that is happening, ultra-various, outside of any statutory authority, we don't think it makes sense to impose, you know, a zone of, a limiting zone of interest analysis, because then you would have injured parties who were never even envisioned to be within the four corners of a statute, who may not be able to get relief. So that is the, you know, that is the analysis that we think applies here, the analysis that the D.C. Circuit applied. All right. Can I ask you, what's your position on the Section 739 issue? We have not taken a position on that in our brief, in our brief, in this litigation and another litigation, we've addressed the 20, we've addressed the appropriations clause violation, and we've addressed Section 2808. So do you have a position? I can't get out in front of anyone, and I'm only allowed to discuss what we've briefed here. There's a process on our end, and I'm really sorry, Your Honors, that I'm not able to do that today. Anything further? Just one, just one further point about the statute, to make clear that, you know, there are three factors in this statute. There's, of course, required, you know, emergency requiring the use of the armed forces, the necessity prong, and then the military construction prong. Only one of the, you know, the administration only has to have been found not to have met one of those for their claim to, their defense to fail under 2808. So thank you very much for your time. Of course. Thank you. Rebuttal? Thank you. Just a few points in rebuttal, if I may. First of all, many of the plaintiffs' arguments today and in their briefs effectively argue that Congress must have impliedly repealed or in some way limited Section 2808. But that's an extraordinary claim in light of the purpose of Section 2808, as we discussed earlier, that purpose being in the instance of a declaration of war or armed forces, to give expansive discretionary authority to the Secretary of Defense. Nothing in the appropriation statutes that they cite or the immigration statutes that the plaintiffs cited today suggests that Congress intended to limit or repeal that authority. Secondly, I want to be clear about the argument that we were discussing earlier and that the Sierra Club plaintiffs' briefs say about the nature of the argument about whether this is a national emergency requiring use of the armed forces. At page 50 of this Sierra Club plaintiffs' brief, they make clear that they are not challenging, as I read that, the President's determination that this is such an emergency. Instead, they appear to be arguing, as I think they have again today, that this Court should undertake an independent determination under Section 2808 of whether this is such an emergency, and we've explained why we think that's not appropriate. Can I ask you a question, since they raised some issues about the zone of interest test? I want to make sure I understand the statute here. In the prior case, there was kind of a three-step process, whereby first there was a transfer, and then there would ultimately be an authorization to waive the environmental laws. As I read 2808 and I read your brief, the waiver of the environmental laws is built into 2808. It's all one switch. We don't have the sort of steps of the request, and then the transfer, and then the waiver of the environmental laws. Am I reading that correctly? Yes, Judge Conch, that's exactly right. It says without regard to any other provision of law, and that's a sweeping non- abstantee or provision that excuses compliance with any other provision. But if that's true, so if you meet the criteria of 2808, and then that flips the switch, and in one shot as opposed to multiple steps, the environmental laws get waived, then why doesn't that bring, for example, the state's concerns about their zone of interest? Because now we're talking about a statute that sets criteria for what will be a waiver of environmental laws. Why doesn't that bring them into the zone of interest? Well, Judge Collins, because the zone of interest looks to the interest sought to be regulated or protected by the provision, and the provision here is, again, giving the Secretary of Defense the authority to act without regard to other laws, not just environmental laws after all, but a wide range of other laws. And that is for the purpose of ensuring that expansive discretionary power that we discussed earlier. There's no indication that Congress intended to allow litigants raising environmental interests to challenge the kinds of limitations that these plaintiffs have sought to invoke. That is to say, military necessity or the definition of a military necessity. They are not proper plaintiffs. They're not what the Supreme Court in Patchak said were ordinary or expected litigants to raise those limitations. And I want to go back to Patchak for a minute, if I may, Your Honor, because the Sierra Club plaintiffs in their argument made the extraordinary claim that Patchak would authorize any interest related to land whenever a statute refers in any way to land use. That's not at all what Patchak says. In fact, it's very clear that it suggests the Supreme Court there analyzed very carefully the particular statute at issue there, and the reasoning was that where the acquisition of land was expected to be based on the possibility of conflict with neighboring landowners, that those litigants to enforce those provisions. Not so here. Very different interests at stake. Looking at this Court's decision in Northwest Requirement Utilities, the plaintiff's arguments here are, as the Court said, at best orthogonal, and here in fact directly contradictory to the interests and purpose of the statute Congress enacted. I do want to address briefly, if I may, the confusion, and I want to go back to the argument raised by the states that somehow the Constitution would prohibit Congress from both imposing, as they view it, some limitation on appropriations for DHS, and at the same time allowing DOD extraordinary emergency authority in 2808. There's no suggestion in any case law under the Appropriations Clause that the limits Congress's authority in that way. In fact, Lincoln against Vigil makes clear that Congress can enact a lump sum appropriation for the Department and impose no limitations at all, and when that's the case, of course it can do what it did here, which is carve out a very specific authority in the event of a national emergency or declaration of war. And finally, Your Honor, I'd like to address revenue reduction. Judge Collins, you asked earlier if we were challenging the Article III standing of any of the plaintiffs here, and we're not, because some of the states have alleged standing, California and New Mexico in particular, with respect to the particular project areas, and so we didn't challenge any of the states' standing in that case. But it is clear as well, as we made clear in our response reply brief, that the kind of indirect tax revenue changes that are in federal policies, they affect the economies of states all the time, Your Honor. Those are not sufficient even for Article III standing if they had sought to litigate those injuries alone, and a fortiori they're not sufficient for either the zone of interest or the balance of harms analyses in this case. What's the portion of the states' standing that you don't challenge? So, Your Honor, the states of California and New Mexico have asserted environmental interests, and we think that those are insufficient in the balance of harms, as we explained in our reply brief, response reply brief, but we don't dispute that they're sufficient for a standing purpose. Then do you challenge the standing of the other however many states are in this case? We would have, Your Honor, if those states had sued alone to challenge solely the tax revenues. However, because the standing of a single plaintiff in a case is sufficient to allow the case to proceed, we have not challenged those independently or separately. Can I ask another question about the logistics here? When the construction at issue here is completed, will DOD maintain a role with respect to the construction or the facilities, or will it relinquish the jurisdiction back to DHS? Judge Collins, I don't believe the record addresses that question directly. The plaintiffs have argued that DOD would abandon these project sites, but I don't think that's supported by the record in this case. I'd want to double check that if there's any remaining question, however. If there are no further questions, we'd urge the Court to vacate and reverse the judgment below. Thank you, Your Honor. Thank you, counsel. Thank all of you for your excellent arguments and briefing in this case, and also for appearing today in difficult circumstances, and for participating or allowing us to change the time at the last minute, which is always disconcerting when you're arguing and you're counting on some certain prep time before your argument. So I hope it accommodates some of your travel needs and it was of assistance to the Court. And unrelated to this case, Mr. Byron, I wanted to let you know, and to a lesser extent, Ms. Leslie, that in the coming months, we're going to make some adjustments on our upcoming panels that will affect some of the people that you're arguing. It's going to be on a case-by-case basis, but we're going to try to accommodate attorneys who wish to appear remotely in light of the ongoing coronavirus situation. If you want to check with our clerk of court, we won't have any firm answers for you today, but since you're here, you may want to check with Molly Dwyer and just establish a line of communication on how to approach those panels if you have attorneys who want to appear remotely. Thank you very much. The case just argued will be submitted for decision and will be in recess for the morning. Thank you, counsel.
judges: Thomas, Wardlaw, Collins